**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **PATRICK ANTHONY RUSSO,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **A-14-CA-685-SS** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Dept. of Criminal Justice–** | § | |
| **Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:     THE HONORABLE SAM SPARKS
        UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas.

Before the Court are Petitioner's Application for Habeas Corpus Relief under 28 U.S.C. § 2254 (Document 1); Petitioner's Memorandum in Support (Document 2) Respondent's Answer (Document 12); and Petitioner's response thereto (Document 14).  Petitioner, proceeding pro se, has paid the filing fee for his application.  For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be denied.

**STATEMENT OF THE CASE**

**A.      Petitioner's Criminal History**

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the 390th District Court of Travis Count, Texas, in cause number 9034220.  A jury found Petitioner guilty of capital murder.  The jury concluded Petitioner would be

a future danger to society but deadlocked on the mitigation special issue.  Accordingly, the trial court imposed a sentence of life imprisonment, to run consecutive to a previous conviction.

The Third Court of Appeals affirmed Petitioner's conviction.  *Russo v. State*, 228 S.W.3d 779 (Tex. App.–Austin 2007).  The Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review.  *Russo v. State*, P.D.R. No. 0928-07 (Tex. Crim. App. Dec. 5, 2007).

Petitioner then filed an application for a writ of habeas corpus.  The trial court entered findings of fact and recommended that relief be denied.  On May 7, 2014, the Court of Criminal Appeals denied Petitioner's application without a written order on the trial court's findings. *Ex parte Russo*, WR-80,818-01, at cover.

**B.    Factual Background**

Diane Holik was found dead in her Austin home on November 16, 2001.  *Russo*, 228 S.W.3d at 785.  Holik was a supervisor at IBM and worked from home.  *Id.*  Holik's coworkers had noted her absence from work on November 16, 2001, and called Austin police asking them to check her home for potential damage from recent inclement weather.  *Id.*  Officers who checked her home later that day noticed dogs inside the home had defecated on the carpet, suggesting they had been locked inside a long time.  *Id.*  Holik's neighbor and realtor, who was working with Holik to sell Holik's house, saw the officers and opened the front door.  *Id.*

The officers found Holik's body face-down in an upstairs guest bedroom.  *Russo*, 228 S.W.3d at 785.  Her body was fully clothed and showed no evidence of a sexual assault.  *Id.*  She had ligature marks on her neck and wrist, apparently caused from a plastic zip-tie.  *Id.*  Holik's necklace and engagement ring were missing, as were several pieces of jewelry and a spare front-door key.  *Id.* at

785–86.   A medical examiner concluded the cause of death was homicide from ligature strangulation.  *Id.* at 786.

One of Holik's coworkers testified she had spoken with Holik by telephone on November 15, 2001.  *Russo*, 228 S.W.3d at 786.  Holik told her a man who had come to look at her house had just left.  *Id.*  A neighbor testified he had seen a gold or brown van in Holik's driveway the same day and had assumed it belonged to a potential buyer of the house.  *Id.*  Other homeowners from the same neighborhood who were selling their houses testified a man had approached them about their houses.  *Id.*  He had given some a different name and claimed he would return with his wife to see the house at a later day.  *Id.*  A composite was prepared from the neighbors' descriptions, and a homeowner from a different subdivision saw the composite and called the police; she had seen the man and written down his van's license-plate number.  *Id.*  Police tracked the license plate to Petitioner.  *Id.*

Police officers later executed a search warrant for Petitioner's home.  *Russo*, 228 S.W.3d at 786.  Petitioner agreed to go with the officers to the police station.  *Id.*  Officers interviewed Petitioner during the ride and again at the station.  *Id.* at 786–87.  Petitioner told the officers that on November 15, he was driving to a radio station to discuss a web site for his Christian rock band, when he got lost in a storm and stopped to ask directions.  *Id.*  He received directions from an older, gray-haired man but did not enter any home.  *Id.*  The manager of the radio station denied Petitioner had appeared at the station on November 15.  *Id.*  After the interview with police, Petitioner met with his pastor and told him he worried the police would arrest him for killing a woman.  *Id.*  He told his pastor jewelry had been taken from Holik, though it was later determined police had not told

3

Petitioner that fact.  *Id.*  The pastor's wife testified Petitioner said he received directions from "a lady" who seemed "kind of bothered" about his being there.  *Id.*

Thirteen homeowners who had been approached by Petitioner testified.  *Russo*, 228 S.W.3d at 787.  Many of them identified Petitioner as the man who came to their home and recited many of the same alleged details about his interest in purchasing their home.  *Id.* at 788.  Several of the witnesses described Petitioner as driving a tan-colored van.  *Id.*  Twelve realtors also identified Petitioner as the man who had contacted them about seeing vacant homes listed between $200,000 and $700,000.  *Id.* at 789.  The realtors testified they felt "uncomfortable" when showing the homes to Petitioner.  *Id.*  Forensic evidence regarding Petitioner's financial situation showed he and his wife had only about $1,800 of available money at the time of Holik's murder and had a $199,000 mortgage on their trailer home.  *Id.*

DNA evidence also linked Petitioner to Holik's home.  Petitioner could not be excluded as a match to biological evidence from Holik's left hand or to hairs found on a green towel in Holik's home.  *Russo*, 228 S.W.3d at 789–90.  A DNA expert called by the State testified "the coincidental chance of obtaining the same [DNA] profile in this case is one in 12.9 million people."  *Id.* at 790.  Electronic evidence taken from Petitioner's computer related to the realtors who testified at trial.  *Id.*  Investigators also found information relating to an "asphyxiation-type pornographic Web site" and death by asphyxiation.  *Id.*  The State called a psychiatrist who opined regarding Petitioner's motive for the killing.  *Id.* at 790–91.  According to the psychiatrist, Petitioner likely was seeking sexual gratification through ligature strangulation as a way of playing out his "fantasy life."  *Id.* at 791.  The defense moved for a verdict of not guilty.  *Id.*  When that motion was denied, the defense rested without offering any evidence.  *Id.*

4

**C.** **Petitioner's Grounds for Relief**

Petitioner raises the following grounds for relief:

1. The state court of appeals made incorrect findings of fact, resulting in an unreasonable conclusion that the evidence was sufficient to support his conviction.

2. The trial court improperly admitted:

    a. images not taken from Petitioner's computer,

    b. testimony regarding Petitioner's alleged sexual motivation for the murder,

    c. hearsay evidence of a third party regarding a statement of the victim, and

    d. testimony of the realtors and homeowners regarding Petitioner's demeanor, in violation of his right to due process; and

    e. evidence beyond the scope of the search warrant, in violation of Petitioner's rights under the Fourth Amendment.

3. The state suppressed exculpatory and impeachment evidence in violation of *Brady v. Maryland*.

4. Petitioner's trial counsel was ineffective for:

    a. failing to conduct independent testing of DNA samples;

    b. failing to depose or subpoena a doctor whose DNA testing allegedly excluded Petitioner from the crime scene;

    c. failing to depose or subpoena FBI agents regarding an investigation of the state crime labs;

    d. failing to investigate the crime-scene videos showing vomit that was not tested to exclude Petitioner;

    e. refusing to investigate or depose the State's "surprise witness";

    f. failing to object under Texas Rule of Evidence 404(b) to the introduction of photos taken from a website;

g.      inadequately cross-examining the homeowners and realtors who testified during trial;

h.      failing to call rebuttal witnesses in support of Petitioner; and

i.      failing to impeach the State's DNA witness who denied the crime labs were under investigation.

## D.     Exhaustion of State Court Remedies

Respondent asserts Petitioner failed to exhaust his second claim regarding admission of extraneous acts evidence in violation of Petitioner's right to due process.  Respondent notes Petitioner did not argue on direct appeal that his due-process rights were violated and, instead, first raised the claim in his state application for habeas corpus relief.  The trial court rejected this ground for state habeas corpus relief because Petitioner did not raise his due-process challenges on direct appeal.  Doc. 23-12 at 59, 61, 63–64.[1]  Thus, the state court concluded, Petitioner's due-process claims were barred from consideration.  *Id.*  The Court of Criminal Appeals adopted those findings when it denied Petitioner's application.  Respondent concludes that, because the state court rejected Petitioner's due-process claims based on a state procedural default, Petitioner's claims likewise are barred from this Court's consideration.

To exhaust his claims in state court, Petitioner "must have fairly presented the substance of his claim to the state courts."  *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (quoting *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997)).  It is not enough that Petitioner discussed the facts that would support a federal claim in the state courts or that he raised a similar state-law challenge.  *Id.* (citing *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  Instead, Petitioner must have raised in the

---

[1] When citing to specific portions of Document 23-12, the Court will use the electronic document number at the top of the page of the document.

state courts the same theory on which he seeks relief in his federal habeas corpus petition to alert the state court that he is "asserting claims under the United States Constitution." *Canales v. Stephens*, 765 F.3d 551, 577 (5th Cir. 2014) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)).

The Court agrees with part of Respondent's assertion.  In his § 2254 petition, Petitioner seeks to challenge introduction of images of nudity and strangulation not taken from Petitioner's computer, testimony depicting Petitioner's alleged sexual motivation for the murder, hearsay evidence of a third party relating a statement of the victim, and testimony from the twelve realtors regarding Petitioner's nervous demeanor.  Though on direct appeal Petitioner challenged the admission of this evidence, he did so only on grounds that the evidence was irrelevant under the Texas Rules of Evidence.  He did not argue that introduction of the evidence violated his right to due process, which is the federal claim he raised in his state application for habeas corpus relief and raises now in his § 2254 petition.  Petitioner has, thus, failed to exhaust his due-process claims.  But Petitioner did argue on direct appeal that the court improperly allowed evidence that went beyond the scope of the search warrant, the same claim he raises in his § 2254 petition.  Accordingly, the Court agrees with Respondent that Petitioner's second ground for relief is procedurally barred with respect to his due-process claims.  His Fourth Amendment claim regarding admission of the evidence allegedly beyond the scope of the search warrant, however, is properly exhausted.  The Court will discuss that claim below.

## DISCUSSION AND ANALYSIS

### A.    The Antiterrorism and Effective Death Penalty Act of 1996

The Supreme Court has summarized the basic principles that have grown out of the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act.  *See Harrington*

*v. Richter*, 562 U.S. 86, 97–100 (2011).  The Court noted that the starting point for any federal court in reviewing a state conviction is 28 U.S.C. § 2254, which states in part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Court noted that "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington*, 562 U.S. at 98.

One of the issues *Harrington* resolved was "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Id.*  Following all of the Courts of Appeals' decisions on this question, *Harrington* concluded that the deference due a state court decision under § 2554(d) "does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (citations omitted).  The Court noted that it had previously concluded that "a state court need not cite nor even be aware of our cases under § 2254(d)." *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).  When there is no explanation with a state-court decision, the habeas petitioner's burden is to show there was "no reasonable basis for the state court to deny relief." *Id.*  And even when a state court fails to state which of the elements in a multi-part claim it found insufficient, deference is still due to that

8

decision, because "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.*

As *Harrington* noted, § 2254(d) permits the granting of federal habeas relief in only three circumstances: (1) when the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the Supreme Court; (2) when the earlier decision "involved an unreasonable application of" such law; or (3) when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *Harrington*, 562 U.S. at 100 (citing 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir. 2000) (quotation and citation omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.

*Id.* at 740–41 (quotation and citation omitted). Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant the writ "if the state court identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 741 (quotation and citation omitted). The provisions of § 2254(d)(2), which allow the granting of federal habeas relief when the state court made an "unreasonable determination of the facts," are limited by the terms of the next section of the statute, § 2254(e). That section states that a federal court must presume state court fact determinations to be correct, though a petitioner can rebut that presumption by clear and convincing evidence. *See* 28

U.S.C. § 2254(e)(1). But absent such a showing, the federal court must give deference to the state court's fact findings. *Id.*

**B.     Unreasonable Determination of Fact**

In his first ground for relief, Petitioner argues that the state court of appeals relied on erroneous facts in affirming his conviction. Petitioner raised this same issue in his state application for habeas corpus relief. The Court of Criminal Appeals rejected the merits of Petitioner's claim. As such, the AEDPA limits the scope of this Court's review to determining whether the adjudication of Petitioner's claim by the state court either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

As noted above, this court presumes the factual findings of the state court are correct. 28 U.S.C. § 2254(e)(1). If Petitioner can rebut that presumption by clear and convincing evidence, however, relief may available on the ground that the state court's conclusions were based on that unreasonable determination of the facts. *Id.*; 28 U.S.C. § 2254(d)(2). Here, however, Petitioner is not arguing the state court's conclusions were unreasonable because those conclusions were based on erroneous factual findings. He is saying only that because the state court allegedly made erroneous factual findings, he is entitled to relief under § 2254. But relief under § 2254 is appropriate only for violations of the Constitution or federal law. 28 U.S.C. § 2254(d)(1); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Relief is not available merely because there allegedly were errors in the state-court proceedings. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). The proper

place to challenge the court of appeals's findings was a petition for discretionary review, which the Court of Criminal Appeals refused in this case.

Respondent suggests Petitioner actually challenges the sufficiency of the evidence. A federal court reviewing the sufficiency of the evidence to support a state court conviction applies the federal standard of review adopted in *Jackson v. Virginia*, 443 U.S. 307 (1979). This Court's review is limited to asking whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Ramirez v. Dretke*, 398 F.3d 691, 694–95 (5th Cir. 2005).

The state court of appeals reviewed the sufficiency of the evidence under *Jackson*. As the state court noted, Petitioner's DNA was found on Holik's left hand, where her missing engagement ring likely had been worn. His DNA also was found on a bath towel found in Holik's living room. The evidence showed Petitioner had twice been to Holik's home before her murder and had been in other homes in the same neighborhood. The afternoon of Holik's murder, a van matching the description of the Petitioner's van was seen parked in front of Holik's house. Evidence also showed Petitioner's interest in ligature strangulation, the same method by which Holik was killed, and expert witness testimony suggested Petitioner would have received sexual gratification from performing ligature strangulation on Holik. Though there were no witnesses to the crime and the missing jewelry was not found, the state court noted, neither witnesses nor location of stolen property are elements of the crimes that must be proven. The court concluded from all the evidence "that a rational jury could have found beyond a reasonable doubt all the essential elements of capital murder." *Russo*, 228 S.W.3d at 795.

Having independently reviewed the state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence.  Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that the state court affirmed his conviction based on erroneous findings of fact or that the evidence was insufficient to support his conviction.

**C.      Fourth Amendment Violation**

The only exhausted claim in Petitioner's second ground for relief is that the trial court improperly admitted evidence obtained beyond the scope of the search warrant and in violation of the Fourth Amendment.

A federal court may not grant habeas relief based on a Fourth Amendment violation where the state has provided an opportunity for full and fair litigation of the issue.  *Stone v. Powell*, 428 U.S. 465, 493–95 (1976); *Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002).  This rule applies to all claims arising under the Fourth Amendment.  *See, e.g.*, *Janecka*, 301 F.3d at 320 (search and seizure); *Jones v. Johnson*, 171 F.3d 270, 277–78 (5th Cir. 1999) (arrest).  A petitioner must plead and prove the state court proceeding was inadequate in order to obtain post-conviction relief in federal court.  *Davis v. Blackburn*, 803 F.2d 1371, 1372 (5th Cir. 1986).  Petitioner raised his Fourth Amendment challenge on direct appeal.  The court of appeals rejected Petitioner's claim on the merits.

It is apparent Petitioner was afforded a full and fair opportunity to litigate his Fourth Amendment issue in state court.  Petitioner is therefore barred from seeking federal habeas relief on these grounds.  *See Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978) ("An 'opportunity for

full and fair litigation' means just that: an opportunity.  If a state provides the processes whereby a defendant can obtain full and fair litigation of a Fourth Amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.").  Accordingly, Petitioner is not entitled to federal habeas corpus relief on this claim.

**D.      Suppression of Evidence**

Next, Petitioner asserts the prosecution suppressed exculpatory and impeachment evidence. Specifically, he alleges the State failed to collect and test evidence of vomit found at the crime scene, which he says constitutes withholding evidence.  He also asserts the State withheld evidence regarding what he calls "inadequate testing procedures within the DPS Crime Lab."  Doc. 1 at 7.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held the suppression by the prosecution of evidence favorable to an accused after a request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.  To establish a *Brady* violation, Petitioner must prove (1) the prosecutor suppressed or withheld evidence (2) which was favorable and (3) material to the defense.  *Id.* at 87; *Allridge v. Scott*, 41 F.3d 213, 217 (5th Cir. 1994).  The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.  *Id.  Brady* encompasses evidence that may be used to impeach a witness's credibility.  *Id.* at 676.  There is no *Brady* violation if the defendant, using due diligence, could have obtained the information.  *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994) (citing *United States v. Ramirez*, 810 F.2d 1338, 1343 (5th Cir. 1987)).

The State's decision not to collect a sample of the vomit was not a violation of *Brady*. First, Petitioner's characterization of the failure to collect a sample of the vomit[2] as tantamount to the suppression of evidence is flawed. The existence of the vomit, and the failure to test it, was not suppressed, as it was a topic of defense cross-examination at trial. Dkt. No. 17-14 at 187-88. Thus, Petitioner could have argued at trial that the failure to test the material created a reasonable doubt regarding his guilt, and could also have raised objections to the failure to test the material. He did neither, however.

Perhaps the reason he did not is reflected in the affidavit of Brady Mills, an assistant laboratory director of the Texas Department of Public Safety Laboratory Service (DPS), explaining that DPS did not conduct DNA analyses on samples of vomit and has no established protocol for doing so. Doc. 23-12 at 22. Mills opined that, because of the high amount of fluid present in vomit, only a low concentration of cellular material would be present in a sample. *Id.* That low concentration of cellular material, Mills wrote, would negatively affect the viability of DNA analysis, which is why DPS has no current protocol for testing these samples. *Id.* Petitioner has not submitted any evidence to contradict this, nor does he offer evidence that there was an existing protocol for testing vomit at the time of his trial.

Even assuming DNA testing of the material were possible at the time of the trial, there is no evidence that the failure to collect or test the material prejudiced Petitioner. To show prejudice, he would have to demonstrate that the there is some reason to think that DNA testing of the substance

---

[2]The record does not reflect the exact nature of the substance. Defense counsel characterized it in his question as something that "looked like vomit." Dkt. No. 17-14 at 187. The detective's response stated that it also "could have been diarrhea, for all I know." *Id.* There is testimony throughout the state court record reflecting that the victim's dogs had defecated and urinated throughout the house before her body was located.

would have identified it as coming from a human—not canine—source, would have attributed it to someone other than him or the victim, and further that those hypothetical results would have led the jury to discount all of the other, compelling evidence of Petitioner's guilt (including the DNA evidence from the victim's left hand), and acquitted him. Such speculation fails to demonstrate prejudice. Indeed, the state trial court concluded this claim was speculative, as Petitioner has no evidence that, had the substance been vomit, and had it been tested, there is any likelihood that DNA testing would have shown the source of the substance to be someone other than Petitioner or the victim, or that the jury would have concluded it cast sufficient doubt on Petitioner's guilt so as to lead to a different trial outcome. That conclusion is not unreasonable.

Petitioner's claim regarding DPS being under investigation similarly lacks merit. As the state court noted, Mills explains in his affidavit that the DPS Austin Laboratory, where the DNA samples from Petitioner's case were tested, was not under any type of investigation or FBI inquiry when Petitioner's case was being prepared. Doc. 23-12 at 22. The documents Petitioner attached to his § 2254 petition discuss "non-critical" problems found in the McAllen, Texas, DPS crime lab. Doc. 2-5 at 3. Nothing in those documents reference an issue specifically regarding the Austin DPS lab. And even if the Austin lab had problems in the past, Petitioner only vaguely asserts those problems existed before or around the time of his trial. There is no evidence that the DNA samples related to his case were affected or that anyone tampered with the samples. Thus, there is no evidence the State withheld material, exculpatory evidence regarding the Austin DPS crime lab or any of the DNA samples used in Petitioner's case.

Having independently reviewed the state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination

of facts in light of the evidence.  Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that the State suppressed exculpatory evidence.

**E.      Ineffective Assistance of Counsel**

In his final ground for relief, Petitioner argues that he was denied effective assistance of counsel.  Petitioner raised this same issue in his state application for habeas corpus relief.  The Court of Criminal Appeals rejected the merits of Petitioner's claim.  Thus, the AEDPA limits the scope of this Court's review to determining whether the adjudication of Petitioner's claim by the state court either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.  In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential.  *Id.* at 686–89.  "A fair assessment of attorney performance requires that every

16

effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation omitted). Ultimately, the focus of inquiry must be on the fundamental fairness of the proceedings whose result is being challenged. *Id.* at 695–97. Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687.

### 1.   Failure to Test DNA Samples

Petitioner first asserts counsel failed to test the DNA samples taken from Holik's left hand and from the green towel found in her home. Petitioner recounts the evidence showing he could not be excluded as the source of one of the samples taken from Holik's hand, yet the second sample revealed no male DNA. Had counsel independently tested this evidence, Petitioner alleges, Petitioner would have been excluded as the source of either DNA sample.

Counsel in criminal cases "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). To establish his counsels' investigation was deficient, Petitioner must specify what more counsel would have uncovered had the investigation been proper and how it

would have altered the outcome of his trial.  *See Trottie v. Stephens*, 720 F.3d 231, 243 (5th Cir. 2013); *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010).

Petitioner has failed to establish counsels' decision not to test the DNA samples independently of the State's testing constitutes ineffective assistance.  Petitioner's defense attorneys submitted an affidavit in response to Petitioner's state application for habeas corpus relief.  In that affidavit, the attorneys explain that the absence of male DNA in the second sample does not diminish the results from the first sample; rather, the absence of male DNA in the second samples merely suggests the second swab "lacked a sufficient amount of DNA to produce an interpretable profile." Doc. 23-12 at 15.  The state court accepted the attorneys' explanation in its findings of fact recommending denying Petitioner's state application for habeas corpus relief, and the Court of Criminal Appeals adopted those factual findings.

Petitioner has not contradicted the state court's factual findings, which this Court must therefore assume are correct.  And even if counsel should have independently tested the DNA samples, Petitioner has not even suggested how the result would have been different with those independent tests.  His assertion that the evidence would have excluded him as the source of the second sample is not enough to warrant habeas corpus relief.  *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983).

2.    Failure to Subpoena and/or Depose DNA Expert

Similar to his first claim, Petitioner next asserts counsel should have deposed DNA expert Dr. Mechthilo Prinz.  Petitioner ties this claim to his first claim of ineffective assistance, insisting the discrepancy in the DNA test results warranted a deposition from Dr. Prinz.To prevail on a claim regarding an uncalled witness, Petitioner must name the witness or witnesses that should have been

called, demonstrate the witness's ability and willingness to testify, provide the contents of the proposed testimony, and show the testimony would have aided his theory that he was not present in Holik's home.  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  These requirements apply to expert witnesses and lay witnesses.  *See id.*; *Evans v. Cockrell*, 285 F.3d 370, 377–78 (5th Cir. 2002).

Though Petitioner has named the witness and the testimony he believes Dr. Prinz would have given, he fails to show how that testimony would have aided his defense.  As noted above, the lack of an identifiable amount of male DNA in the second sample did not exclude Petitioner as the source of the male DNA found in the first sample taken from Holik's hand.  Nor did the absence of male DNA in the second sample suggest the State's testing method was sloppy or unreliable, as Petitioner asserts.  Because there is no exculpatory purpose the second DNA sample would have served, counsel had no reason to subpoena or depose Dr. Prinz to question him about the sample.  Petitioner again has not shown how he was prejudiced by counsels' decision not to depose or subpoena Dr. Prinz, and this claim for relief fails.

3.    Failure to Depose FBI Witnesses Regarding Crime Lab Investigation

Petitioner next asserts counsel should have deposed FBI witnesses regarding the alleged investigation of the Austin crime lab.  But as this Court noted above, there is no evidence that the Austin crime lab was under investigation during the time it was processing the DNA samples from Petitioner's case.  Moreover, as with his claim regarding counsels' failure to depose Dr. Prinz, Petitioner does not name the witnesses he believes counsel should have deposed, demonstrate their ability or willingness to testify, explain what those witnesses would have said, or show how that

testimony would have aided his defense.  *See Day*, 566 F.3d at 538.  The ground for relief is without

any elaboration or explanation and, therefore, is also without merit.

      4.      <u>Failure to Investigate Crime Scene Videos</u>

Petitioner turns next to the video of the crime scene.  He contends the pool of vomit seen in

the video contains DNA evidence counsel should have tested.  He believes the vomit is from the

"actual murderer."

The Court already addressed Petitioner's claim regarding the vomit.  As noted above,

assuming the substance was vomit and not dog excrement, DPS had no established protocol for

testing samples of vomit for DNA.  As Brady Mills explained, the high level of liquid in samples of

vomit made collecting a viable DNA sample difficult, if not impossible, at least at the time of the

trial.  Because there was no available method for testing vomit at the time of the investigation in this

case, counsel did not perform deficiently by failing to obtain a sample of the vomit or to have a

sample tested for DNA.  Indeed, the record suggests that investigators never collected a sample of

the vomit, Dkt. No. 17-14 at 187, and counsel could not have been deficient for not testing a sample

that did not exist.

      5.      <u>Refusal to Investigate "Surprise Witness"</u>

Petitioner next challenges counsels' alleged failure to investigate and prepare for the

testimony of the State's "surprise witness," Robert Hebner.  Petitioner accuses counsel of failing to

depose Hebner or prepare for his testimony, which consisted of his recollection that he had seen a

van similar in color to Petitioner's parked in Holik's driveway at the time of the murder two years

earlier.  Hebner, however, had not told the police he had seen the van until the trial already had

begun.  Petitioner insists that, had counsel prepared for this testimony, counsel could have

impeached Hebner and led support to the defense theory that Holik's fiancé had committed the murder.

Counsel for Petitioner related in their affidavit that the State sought to introduce Hebner's testimony only after both sides had concluded their opening statements.  The trial judge, however, allowed defense counsel to interview Hebner before deciding whether Hebner would be allowed to testify.  After questioning Hebner, defense counsel concluded he was truthful, though reluctant to testify.  Counsel did not believe the defense would have benefitted from additional time to interview Hebner.  Counsel objected to his testimony based on the "surprise aspect of his testimony" and thoroughly cross-examined him.  Doc. 23-12 at 6.  The trial court in Petitioner's state habeas corpus proceedings credited counsels' statements from their affidavit and concluded counsel was not ineffective regarding their handling of Hebner.  The Court of Criminal Appeals adopted that reasoning when it denied Petitioner's state application for habeas corpus relief.

Hebner testified that he originally believed Holik had been murdered at night, between 8:00 and 10:00 pm.  Doc. 18-4 at 32–33.  He learned for the first time while the trial was proceeding that Holik actually had been murdered between 4:00 and 6:00 pm.  *Id.* at 32.  Hebner remembered seeing a van parked in front of Holik's house as he was returning from work, around 5:15 pm.  *Id.* at 34. He said he did not tell the police sooner because he had been under the assumption the murder took place later in the night.  *Id.* at 40.  He added that he had tried not to follow media coverage of the trial and became aware of the time of Holik's murder only after his wife sent him an email regarding a newspaper article she had read about the trial.  *Id.*

Petitioner has again failed to show counsel were ineffective on this ground.  Petitioner offers no support for his assertion that additional time with Hebner would have uncovered his belief that

21

Holik's fiancé was the true murderer.  As counsel explained in their affidavit, there was no additional information Hebner could offer to assist the defense.  Petitioner has not shown what more counsel could have discovered or how that other evidence would have assisted the defense. *See Trottie*, 720 F.3d at 243; *Gregory*, 601 F.3d at 352.  This ground for relief fails.

6.  Failure to Object under Rule 404(b)

Petitioner next faults counsel for failing to object under Texas Rule of Evidence 404(b) to the introduction of evidence from a website.  At trial the State sought to introduce pictures taken from the website "necrobabes.com," of which Petitioner was a member.  Counsel objected under Rules of Evidence 401 and 403, citing the irrelevant and unfairly prejudicial nature of the pictures. Some of those objections were sustained, but the court allowed in pictures depicting a woman being strangled in her own home.  Petitioner now argues counsel also should have objected under Rule 404(b), which prohibits introduction of evidence regarding extraneous evidence.

When reviewing counsel's strategic decisions, the Supreme Court has instructed courts to apply a heavy presumption of reasonableness.  *See Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006) (citing *Strickland*, 466 U.S. at 689).  "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690).  Counsel's choice of strategy may constitute ineffective assistance only when "it is so ill chosen that it permeates the entire trial with obvious unfairness." *Virgil*, 446 F.3d at 608 (quoting *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004)).

Counsel for Petitioner explain in their affidavit that they objected under Rules 401 and 403 only because the images were not pornographic, and Petitioner's viewing of the images did not

22

constitute an extraneous offense under Rule 404(b). Doc. 23-12 at 16. Counsel decided not to object under Rule 404(b) because they were concerned that objecting under that rule would allow in more evidence regarding Petitioner's scheme and design in this case and evidence of his prior conduct. The state court reviewing Petitioner's state application for habeas corpus relief concluded counsels' decision not to object under Rule 404(b) was reasonable. The state court also concluded that, assuming counsel had performed deficiently, Petitioner failed to show how he was prejudiced by counsels' performance. The Court of Criminal Appeals adopted the trial court's reasoning when it denied Petitioner's application.

Petitioner has not shown the state court's decision was unreasonable. Petitioner offers nothing to suggest his attorneys' decision not to object under Rule 404(b) was an unreasonable one. Though Petitioner takes issue with his counsels' strategy, he has not shown that an objection under Rule 404(b) would have excluded evidence not excluded by counsels' objections under Rules 401 and 403. Thus, even if counsels' decision were not reasonable, Petitioner has not shown that he suffered prejudice as a result of their strategic choice. This ground for relief fails.

7.    Inadequate Cross Examination

Petitioner next asserts trial counsel failed to subject the realtor and homeowner witnesses to vigorous cross-examination. He lauds counsels' efforts at a pretrial hearing to examine those same witnesses, noting counsels' discussion of Petitioner's struggle with Tourette Syndrome. Yet, Petitioner alleges, counsel did not examine the same witnesses as vigorously during the trial and did not ask them about Petitioner's Tourette Syndrome. He contends counsels' effort at trial was deficient and prejudiced him.

Decisions regarding cross-examination are strategic in nature and "usually 'will not support an ineffective assistance claim.'" *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)).  In their affidavit, counsel for Petitioner aver they objected in writing to the witnesses' testimony as irrelevant and prejudicial. They decided that at trial, however, it would not be "a fruitful strategy for the Defense" to vigorously cross-examine the women's testimony regarding Petitioner's "conduct that upset and frightened them." Doc. 23-12 at 17.  Once again, the trial court concluded counsels' decision was a reasonable strategic decision, and the Court of Criminal Appeals adopted the trial court's findings.

Petitioner takes issue with this strategy.  But he again fails to explain why counsels' decision was an unreasonable one or how the state court's finding that counsel performed reasonably was itself an unreasonable conclusion.  Nor does Petitioner show what the defense had to gain by following a different strategy that involved vigorously cross-examining the realtors and homeowners. Petitioner thus fails to establish his counsels' performance was deficient or that it prejudiced his defense not to apply a vigorous cross-examination of these witnesses.

8.    Failure to Call Rebuttal Witnesses

Petitioner next contends counsel were ineffective because they did not call various rebuttal witnesses at trial.  He says witnesses were available to (1) explain why Petitioner had viewed the homes, (2) testify that the zip-ties found at his home did not belong to him, and (3) describe to the jury why it was "natural" for the women to feel uncomfortable around Petitioner because of his Tourette Syndrome.  Doc. 2 at 23.

As with Petitioner's earlier claims regarding uncalled witnesses, this claim fails.  Petitioner names a few of the witnesses who, he says, could have testified about his purpose for viewing the

homes and his reason for having the zip-ties.  But he does not suggest those witnesses were available and willing to testify, specify what each witness would have said, or demonstrate why that testimony would have been favorable to his defense.  *See Day*, 566 F.3d at 538.  He does not even name a witness who could have testified regarding the "natural" feeling of awkwardness for a person not familiar with Tourette Syndrome sufferers.  This claim, like all of Petitioner's claims regarding an unutilized witness, falls short of establishing counsels' ineffectiveness.

9.      Failure to Impeach Witness Mills

Last, Petitioner faults counsel for not impeaching assistant laboratory director Brady Mills. Petitioner again alleges the Austin DPS lab was under investigation and insists Mills's testimony regarding the DNA samples used in Petitioner's case could have been impeached by asking Mills about the investigation.  But, as the Court has noted multiple times, there is no evidence the Austin DPS lab was under any sort of investigation during the time Petitioner's case was being investigated. Petitioner's attachments reference the lab in McAllen, Texas, and do not specifically reference problems in the Austin lab.  Because there is no evidence of an investigation at the Austin lab, counsel had no foundation to attempt to impeach Mills by bringing up the investigation taking place at other labs.  This claim is without merit.

10.      Conclusion

Having independently reviewed the state court record, neither the state court's application of clearly established federal law nor its determination of the facts in light of the evidence, was unreasonable.    Accordingly, Petitioner's ineffective assistance of counsel claim fails.

**RECOMMENDATION**

It is recommended that Petitioner's application for a writ of habeas corpus be denied.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed.  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484).  Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

26

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150–53 (1985); *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 1st day of October, 2015.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE