IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

PATRICK ANTHONY RUSSO,
                    **Petitioner,**

                                                    CAUSE NO.:
-vs-                                                A-14-CA-00685-SS

WILLIAM STEPHENS,
                    **Respondent.**

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Petitioner Patrick Anthony Russo's Petition for Writ of Habeas Corpus [#1], Petitioner's Memorandum in Support [#2], Respondent William Stephens's Response [#12], Petitioner's Reply [#14] thereto, and the Report and Recommendation of United States Magistrate Judge Andrew W. Austin [#25]. Neither party filed objections to the Report and Recommendation. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

All matters in this case were referred to United States Magistrate Judge Andrew W. Austin for report and recommendation pursuant to 28 U.S.C. § 636(b) and Rule 1(f) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges. Russo is entitled to de novo review of the portions of the Magistrate Judge's report to which he filed specific objections. 28 U.S.C. § 636(b)(1). All other review is for plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc). Although Russo did not file any

1

objections, this Court has reviewed the entire file de novo, and agrees with the Magistrate Judge's recommendation.

**Background**

I.    **Russo's Criminal History**

William Stephens (Stephens) avers he has lawful and valid custody of Patrick Anthony Russo (Russo) pursuant to the judgment and sentence of the 390th District Court of Travis County, Texas. A jury convicted Russo of capital murder. Because the jury could not reach a unanimous decision on the mitigation issue, the trial court imposed a lifetime sentence to run consecutively with a previous conviction.

On June 7, 2007, the Third Court of Appeals in Austin affirmed Russo's conviction. *See Russo v. State*, 228 S.W.3d 779 (Tex. App.—Austin 2007, pet. ref'd). The Texas Court of Criminal Appeals refused Russo's petition for discretionary review. *Russo v. State*, P.D.R. No. 0928-07 (Tex. Crim. App. Dec. 5, 2007). Russo then challenged his conviction in a state application for writ of habeas corpus. The trial court entered findings of fact and recommended relief be denied. The Texas Court of Criminal Appeals agreed, denying Russo's application on May 7, 2014 without written order based on the trial court's findings. *Ex parte Russo*, WR-80,818-01.

II.   **Factual Background**

Diane Holik was found dead in her North Austin home on November 15, 2011. *Russo*, 228 S.W.3d at 785. As a supervisor for IBM, Holik worked from home and was in frequent contact with IBM colleagues across the country. *Id.* When Holik's colleagues noted her absence from a scheduled conference call on November 16, 2001, one of them notified the police and requested a safety check of Holik's home for potential damage caused by recent severe

thunderstorms. *Id.* Police officers checked Holik's house that afternoon and noted the doors and windows were locked, and it appeared dogs inside the house had defecated on the carpet. *Id.* Holik's neighbor and realtor noticed the officers and let them inside Holik's house. *Id.*

The officers found Holik's body face down on the floor in an upstairs guest bedroom. *Russo*, 228 S.W.3d at 785. Holik was fully clothed and her body showed no signs of sexual assault. *Id.* Her neck and wrists bore ligature marks. *Id.* A medical examiner later determined the cause of death was homicidal ligature strangulation. *Id.* A spare front-door key was discovered missing, as well as several pieces of jewelry, including her necklace and engagement ring. *Id.*

Prior to her death, Holik was trying to sell her house to move to Houston to join her fiancé. *Russo*, 228 S.W.3d at 785. Her house was listed with a realtor and there was a "for sale" sign in the front yard. *Id.* One of Holik's colleagues testified she had spoken with Holik on the afternoon of November 15, 2001, and Holik told her a man who had come to look at her house had just left. *Id.* A neighbor also testified he had seen a gold or brown van in Holik's driveway that afternoon and had assumed it belonged to a potential buyer of the house. *Id.*

The investigation eventually revealed some of Holik's neighbors were approached on November 15, 2001 by a man claiming to be interested in buying their houses. *Id.* at 786. The man had given the neighbors different names, explaining he would return soon with his wife to look at the property and was prepared to pay for the house in cash because he had just sold a ranch. *Russo*, 228 S.W.3d at 786. Based on the neighbors' descriptions, a composite was prepared and published in the newspaper. *Id.* A homeowner in a neighboring subdivision called the police after seeing the composite in the newspaper. *Id.* She told the police a man generally fitting this description had come to look at her house on two separate occasions. *Id.* After the second encounter, the woman became suspicious and had written down the license plate number

on the man's minivan. *Id.* The police linked the license plate number to Russo. *Russo*, 228 S.W.3d at 786.

On November 21, 2001, the police executed a search warrant of Russo's home. *Id.* Russo agreed to accompany the officers to the police station. *Id.* Officers interviewed Russo during the ride to the station and again at the station. *Id.* at 786-87. Russo told the police that on the afternoon of November 15, 2001, Russo had driven to a radio station in northwest Austin to discuss a website for his Christian rock band. *Id.* at 787. No one at the radio station answered when he knocked, and he left soon after when a storm began. *Russo*, 228 S.W.3d at 787. On his way home, Russo got lost in the storm and stopped at a house to ask for directions; in Russo's story, an older, gray-haired man gave him directions. *Id.*

The police released Russo from custody later that day. *Id.* After the interview, Russo met his pastor and told him he was worried the police would arrest him for killing a woman and stealing her jewelry. *Id.* However, the police never told Russo that any jewelry was missing from Holik's home. *Id.* At trial, the pastor's wife testified that during this conversation, Russo mentioned a woman answered the door when he stopped to ask for directions, and she seemed "kind of bothered" by Russo's presence. *Russo*, 228 S.W.3d at 787. Moreover, the testimony of the manager of the radio station revealed Russo did not show up at the radio station on the afternoon of November 15, 2001. *Id.*

During trial, the prosecution called thirteen witnesses who were either realtors or individuals attempting to sell their homes from May 2001 to November 2001. *Id.* Many of these witnesses were able to identify Russo as the man who had expressed interest in buying their homes. *Id.* at 788. All but one of these witnesses were women. *Id.* at 787. In addition, twelve realtors testified that in 2001, a man had contacted them about seeing vacant homes listed

between $200,000 and $700,000 and had identified himself as a cash buyer; most of the realtors identified Russo as the man who had contacted them. *Russo*, 228 S.W.3d at 789. Many of the realtors testified they were "uncomfortable" while showing homes to Russo; in several instances, Russo had insisted on meeting women realtors alone at the vacant houses. *Id.* Forensic evidence of Russo and his wife's financial situation revealed they had approximately $1,796.19 in available funds at the time of Holik's murder and a $199,000 mortgage on their trailer home in Bastrop, Texas. *Id.*

In addition to the testimony at trial, DNA evidence linked Russo to Holik's murder. Russo could not be excluded as the source of the DNA evidence found on Holik's left hand or two hairs retrieved from a green towel in Holik's home. *Id.* at 789–90. A DNA expert testified the coincidental chances of obtaining the same DNA profile would be one in 12.9 million people. *Id.* at 790.

Finally, to establish motive, the State called a psychiatrist who suggested Russo was likely seeking sexual gratification through ligature strangulation as a way of playing out his "fantasy life." *Russo*, 228 S.W.3d at 790–91. Indeed, in searching Russo's computer pursuant to a search warrant, the State discovered Russo had a subscription to "necrobabes.com," an "asphyxiation-type pornographic" website. *Id.* at 790. The evidence further established the website had been accessed from Russo's computer two days before the offense occurred. In total, "[s]ome 1,200 'necrobabes.com' related images were recovered" from Russo's computer. *Id.*

Upon the close of the State's case-in-chief, the defense moved for a verdict of not guilty. *Id.* at 791. When the motion was denied, the defense rested without offering any evidence. *Id.*

## III.    Russo's Grounds for Relief

Russo raises the following grounds for relief:

(1) The state court of appeals relied on erroneous findings of fact in affirming his conviction;

(2) The trial court:

    a.  violated his right to due process by admitting into evidence—

        i.  images of nudity and strangulation that were taken from a website and not recovered from Russo's computer,

        ii.  testimony regarding Russo's alleged sexual motivation for the murder,

        iii.  hearsay evidence of a third party regarding a statement of the victim,

        iv.  testimony of realtors and homeowners regarding Russo's demeanor, and

    b.  violated his Fourth Amendment rights by admitting evidence beyond the scope of the search warrant;

(3) The state suppressed exculpatory and impeachment evidence in violation of *Brady v. Maryland*; and

(4) Russo received ineffective assistance of counsel for:

    a.  failing to conduct independent test of DNA samples,

    b.  failing to depose or subpoena the DNA analyst whose testing allegedly excluded Russo from the crime scene,

    c.  failing to depose or subpoena FBI agents regarding an investigation of the state crime labs,

    d.  failing to investigate the crime scene videos showing vomit that was not tested to exclude Russo,

    e.  refusing to investigate or depose the State's "surprise witness,"

    f.  failing to object under Texas Rules of Evidence 404(b) to the introduction of images taken from a "necrobabes.com,"

    g.  inadequately cross-examining the realtors and homeowners who testified during trial,

h.  failing to call rebuttal witnesses, and

i.  failing to impeach the State's DNA witness who denied the crime labs were under investigation.

## IV.  Exhaustion of State Court Remedies

Stephens argues Russo failed to exhaust part of his second claim regarding the admission of extraneous acts evidence in violation of Russo's right to due process. The state habeas court refused to review Russo's due process challenge to the admission of the following evidence: images of nudity and strangulation that were taken from a website and not recovered from Russo's computer; testimony regarding Russo's alleged sexual motivation for the murder; hearsay evidence of a third party regarding a statement of the victim; and testimony of realtors and homeowners regarding Russo's demeanor. Although Russo challenged the admission of this evidence on direct appeal, he did so on the basis of relevancy under the Texas Rules of Evidence and not as a violation of his due process rights. Because Russo failed to timely raise his constitutional objection to the admission of the evidence at trial or on direct appeal, the state habeas court held Russo was procedurally barred from raising the issue in this habeas petition. State Ct. R. [#23-12] (State Habeas Proceeding) ¶ 56; *see Smith v. State*, 993 S.W.2d 408, 411 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("Although a writ of habeas corpus is available to challenge the denial of constitutional rights, a timely objection is required to preserve error."); *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996) ("[T]he writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal.").

Because the state court concluded Russo's constitutional challenge to the admission of this evidence was procedurally barred, this Court cannot consider the same claim in a federal habeas corpus proceeding. *See Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) ("[T]he

federal habeas court will not consider a claim that the last state court rejected on the basis of an adequate and independent state procedural ground.").

However, Russo did argue on direct appeal one evidentiary error which survives in his § 2254 petition: the trial court improperly admitted evidence beyond the scope of the search warrant in violation of his Fourth Amendment rights. *See Russo*, 228 S.W.3d at 800. Because this latter claim was properly exhausted, the Court addresses it below. *See infra* Section II.B.

## Analysis

### I.      Legal Standard

Federal habeas corpus relief is governed primarily by the Antiterrorism and Effective Death Penalty Act of 1996, colloquially known as AEDPA. Section 2254 permits the granting of federal habeas relief in only three circumstances: (1) when the state court's decision "was contrary to" clearly established federal law as decided by the Supreme Court; (2) when the state court's decision "involved an unreasonable application of" such law; or (3) when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 96–100 (2011) (citing 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). State court factual determinations are presumed to be correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### II.      Application

Russo asserts four grounds of relief: (1) the state court of appeals made an unreasonable determination of the facts; (2) the trial court erred in admitting evidence beyond the scope of the search warrant in violation of Russo's Fourth Amendment rights; (3) the State failed to disclose *Brady* material; and (4) Russo's counsel was ineffective. The Court addresses each in turn.

## A.     Unreasonable Determinations of Fact

In his first ground for relief, Russo argues the state appellate court relied on an unreasonable determination of the facts in affirming his conviction. As noted above, the Court's review under § 2254 is limited to whether: (1) the state court's decision "was contrary to" clearly established federal law as decided by the Supreme Court; (2) the state court's decision "involved an unreasonable application of" such law; or (3) the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *See Harrington*, 562 U.S. at 96–100. While a federal court presumes state court factual determinations to be correct, Russo may overcome the presumption with clear and convincing evidence that the state court's conclusions were based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(e)(1).

In this case, Russo has not shown the state court based its conclusion on an unreasonable determination of the facts. The Court construes Russo's argument as a challenge to three findings of fact, claiming that: (1) a house key was originally described as missing but was "ultimately accounted for," (2) one DNA analyst found no male DNA profile in a swab taken from the victim's left hand, and (3) Russo was apparently excluded as the contributor of two hairs retrieved from a green towel. *See* Mem. [#2] at 6. However, Russo has not demonstrated these findings of fact were unreasonable, much less that the state court based its decision on these three facts. First, Russo cites to "RR Vol. 34:54" as evidence that the missing key was ultimately accounted for, but the Court finds no such evidence in the record. Second, two DNA samples were taken from Holik's left hand, and the absence of a male factor in the second DNA sample does not indicate the analyst's conclusion that Russo could not be excluded as the contributor of the first DNA sample was erroneous. *See infra* Section II.D.i. At most it shows the second swab

did not contain sufficient DNA from which to obtain a sample. Finally, Russo cites to the record a second time—this time to "RR Vol. 37:26-27"—as evidence that he was excluded as the contributor of two hairs retrieved from a green towel. However, this portion of the record only states that Russo was excluded as the contributor of "[o]ne area" of the towel removed for DNA testing. State Ct. R. [#18-8] (Brady Mills Trial Testimony) at 10. The later testimony of Kimberlyn Smith, a forensic examiner at Mitotyping Technologies in Pennsylvania, reveals Russo could not be excluded as the contributor of two hairs retrieved from the towel. *Id.* at 28. Accordingly, Russo's argument falls short of establishing erroneous findings of fact.

Stephens construes Russo's petition as a challenge to the legal sufficiency of the evidence. In reviewing whether the evidence was sufficient to support a state court conviction, a federal court must view the evidence in the light most favorable to the prosecution and determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The state appellate court reviewed the legal sufficiency of the evidence. *See Russo*, 228 S.W.3d at 791. In its review, the court considered the following evidence: Russo's DNA was found on Holik's left hand, likely where she wore her missing engagement ring; Russo's hairs were found on a towel located in Holik's living room; the evidence showed Russo had been to Holik's home twice on November 15, 2001, as he had to been to other homes for sale in Holik's neighborhood that same day; Holik's neighbor testified a van matching the description of Russo's van was parked in front of Holik's house; Russo lied to the police about having gone to a radio station the afternoon of Holik's murder; other evidence showed Russo had accessed "necrobabes.com" just days before Holik's murder; and an expert witness suggested Russo would have received sexual gratification from performing ligature strangulation of Holik. *See Russo*, 228 S.W.3d at 793–95.

Russo criticizes the legal sufficiency of the evidence, because there were no eyewitnesses to the offense and the missing jewelry was never found. However, as the state appellate court reasoned, eyewitness testimony and recovery of stolen property are not elements of the crime to be proven. *Id.* at 794; *see also Chaney v. State*, 474 S.W.2d 711, 712 (Tex. Crim. App. 1972) (holding the evidence was sufficient to sustain a conviction for theft even though the defendant was not found in possession of the stolen property). Accordingly, even without this evidence, a rational jury could have found the essential elements of capital murder committed during the course of a robbery beyond a reasonable doubt. *See Russo*, 228 S.W.3d at 795.

**B.     Fourth Amendment Violation**

The only properly exhausted claim in Russo's second ground for relief is his challenge to the admission of evidence beyond the scope of the search warrant in violation of his Fourth Amendment rights. Specifically, Russo claims the police exceeded the scope of the initial search warrant by using information they learned during their search of Russo's computer to obtain a second warrant expressly authorizing the search of "necrobabes.com" computer files. *See Russo v. State*, 228 S.W.3d 779, 805 (Tex. App.—Austin 2007, pet. ref'd).

"[W]here the State has provided an opportunity for a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). In order to obtain post-conviction relief in federal court, a petitioner must plead and prove he was denied a full and fair hearing in state court. *Davis v. Blackburn*, 803 F.2d 1371, 1371 (5th Cir. 1986). To satisfy this standard, the state must have afforded "the defendant in a criminal case the opportunity to litigate whether evidence obtained

11

in violation of the [F]ourth [A]mendment should be excluded." *Caver v. Alabama*, 577 F.2d 1188, 1193 (5th Cir. 1978).

The record in this case makes abundantly clear Russo was afforded a full and fair hearing by the state court. He raised his Fourth Amendment challenge on direct appeal, and upon a solid evidentiary record, the Third Court of Appeals concluded the trial court did not abuse its discretion in admitting the evidence. *See Russo*, 228 S.W.3d at 805. Accordingly, Russo received a full and fair hearing in state court on his Fourth Amendment claim and is not entitled to federal habeas corpus relief on this claim.

## C.     Failure to Disclose *Brady* Material

Russo alleges the State suppressed exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to collect and test evidence of vomit found at the crime scene and withholding evidence regarding "inadequate testing procedures within the DPS Crime Lab." Pet. [#1] at 9. To establish a *Brady* violation, Russo must show, among other things, the evidence allegedly withheld is material to the defense. *Brady*, 373 U.S. at 87. Evidence is material only where there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed. *United States v. Bagley*, 473 U.S. 667, 681–82 (1985).

Russo first claims the State's failure to collect and test vomit[1] found at the crime scene constituted a *Brady* violation. As an initial matter, however, the State did not suppress this evidence, because the existence of the vomit and the State's failure to test it was a subject of defense counsel's cross-examination at trial. State Ct. R. [#17-14] (Detective De Los Santos

---

[1] The exact nature of the substance appearing to be vomit cannot be ascertained, because it was never tested. The investigator testified the substance "could have been diarrhea, for all I know." Detective De Los Santos Trial Testimony at 50. Indeed, the substance may have originated from the victim's dogs, because there is evidence in the record suggesting the victim's dogs defecated in the house prior to the discovery of her body.

Trial Testimony) at 50. Russo was free to argue at trial that the vomit belonged to the "actual murderer" in order to create a reasonable doubt as to Russo's guilt. Russo cannot disguise his counsel's strategic decision to not aggressively pursue this theory at trial as a *Brady* violation.

Moreover, Brady Mills, the supervising criminalist at the Department of Public Safety (DPS) lab in Austin, testified that the DPS crime lab in Austin had no established procedures for analyzing vomit samples at the time of the investigation. State Ct. R. [#23-12] (Brady Mills Decl.) at 22. Mills explained this was due in part to the fact that vomit typically contains a high volume of fluid and a correspondingly low concentration of cellular material. *Id.* According to Mills, the low concentration of cellular material would negatively affect the viability of DNA analysis. *Id.* Moreover, even assuming DNA testing of the vomit was available at the time, there is no evidence that the result of the proceeding would have been different had the vomit been collected and tested. In order to demonstrate this evidence was material, Russo would have to show the substance originated from a human, not Holik's dogs; the human contributor of the substance was neither Russo nor Holik; and the existence of an alternate suspect would have led the jury to discount the compelling evidence of Russo's guilt and thereafter acquit him. The state habeas court determined Russo's claim that the prosecution suppressed evidence was without merit. *See* State Habeas Proceeding ¶ 96. Because Russo's claim is completely speculative, the Court agrees and therefore finds the state court's conclusion was not unreasonable. *See Harrington*, 562 U.S. at 96–100.

Russo's second claim regarding the alleged investigation of the DPS crime lab in Austin similarly lacks merit. To support his claim, Russo provided the Court with the legislature's investigative report into "non-critical" problems at a DPS crime lab located in McAllen, Texas. Mem. [#2-5] (Leg. Report) at 3. However, nothing in the document refers to the DPS Austin

Laboratory, where the DNA samples at issue were tested. And even assuming the DPS crime lab

in Austin was under investigation at some point, which Mills refutes in his affidavit, Russo has

provided no evidence that the DNA samples in *this* case were improperly handled. The state

habeas court concluded that Russo had failed to establish a *Brady* violation on these grounds. *See*

State Habeas Proceeding ¶ 97. This Court again agrees, and therefore finds the state court's

conclusion was not unreasonable. Accordingly, Russo cannot establish the State failed to

disclose *Brady* material.

### D.    Ineffective Assistance of Counsel

In his final ground for relief, Russo claims he received ineffective assistance of counsel.

The United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984),

provides the familiar two-pronged test for establishing an ineffective assistance claim:

> First, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable. Unless a defendant
> makes both showings, it cannot be said that the conviction . . . resulted from a
> breakdown in the adversary process that renders the result unreliable.

*Id.* at 687. To establish deficient performance, Russo must show his counsel's actions were not

"reasonable in light of all the circumstances," overcoming the "'strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance.'" *United*

*States v. Haese*, 162 F.3d 359, 364 (5th Cir. 1998) (quoting *Strickland*, 466 U.S. at 689). To

establish prejudice, Russo must show "'there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting

*Strickland*, 466 U.S. at 694). Counsel is not "required to make futile motions or objections."

*Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990). Nor will counsel be considered "deficient for

failing to press a frivolous point." *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995). The

Fifth Circuit has further clarified the operation of the *Strickland* standard in the AEDPA context:

> It bears repeating that the test for federal habeas purposes is *not* whether [the petitioner] made [the *Strickland*] showing. Instead, the test is whether the state court's decision—that [the petitioner] did *not* make the *Strickland* showing—was contrary to, or involved an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim.

*Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003) (emphasis in original). Thus, this

Court's review of an ineffective assistance claim is doubly deferential. Russo has manifestly

failed to make the requisite showing.

i.      **Failure to Test DNA Samples**

Russo first asserts his counsel's failure to independently test DNA samples taken from

Holik's left hand and from the green towel constitutes ineffective assistance of counsel.

According to Russo, additional independent testing of this DNA would have excluded him as a

contributor and furthered his theory that he was not present at Holik's home at the time of her

murder.

Two swabs were taken from Holik's left hand and tested by DPS's Brady Mills and Dr.

Mechthilo Prinze, a DNA analyst residing in New York. Mills concluded Russo could not be

excluded from the DNA sample; Dr. Prinze did not reach the same conclusion, because she was

unable to detect any male-specific DNA on the second swab. *See* Brady Mills Trial Testimony at

8.

In light of this result, Russo's counsel testified they did not seek duplicative DNA testing

because "[t]he absence of male DNA on the second swab submitted to Dr. Prinze in no way

undermines the results of the first DNA test performed, nor does it suggest that cross-

contamination occurred without some proof that [Russo's] reference sample came in contact with

the [] swab from the victim's hand during the testing process." State Ct. R. [#23-12] (Attorney Decl.) at 14. The Court agrees that the absence of a male factor in Dr. Prinze's swab does not indicate Mills's conclusion was erroneous, and at most suggests the second swab tested by Dr. Prinze lacked a sufficient amount of DNA from which to obtain a sample. Accordingly, Russo has failed to show his counsel's performance was deficient.

ii.     **Failure to Depose or Subpoena Dr. Prinze**

Russo next faults his counsel for failing to depose or subpoena Dr. Prinze. Russo argues an alleged discrepancy in the DNA results, which formed the basis of his first claim of ineffective assistance, necessitated the deposition of Dr. Prinze. The Fifth Circuit has repeatedly explained, "complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Accordingly, in order to prevail on an ineffective-assistance-of-counsel claim based on an uncalled witness, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Id.*

In this case, although Russo has named Dr. Prinze as the witness and speculated as to the content of Dr. Prinze's testimony, he has not shown how Dr. Prinze's testimony would have been favorable to his defense. As noted above, the mere fact that the second DNA sample lacked an identifiable amount of male DNA does not exclude Russo as the contributor of the male DNA found in the first sample taken from Holik's hand. Neither does it suggest the State's DNA testing of the first sample was flawed. Moreover, Russo has provided the Court with no

16

information regarding Dr. Prinze's availability or willingness to testify at trial. Without more, Russo cannot prevail on his ineffective-assistance-of-counsel claim based on his counsel's failure to depose or subpoena Dr. Prinze.

### iii.     Failure to Depose or Subpoena FBI Witnesses

Russo argues his counsel should have deposed FBI witnesses regarding the alleged investigation of the Austin crime lab. However, as an initial matter, Russo has not provided the Court with any evidence that the DPS crime lab in Austin was under investigation, by the FBI or any other investigatory body. Moreover, in bringing his ineffective-assistance-of-counsel claim, Russo has completely failed to name the witnesses his counsel should have deposed or provide the contents of their proposed testimony. *See Day*, 566 F.3d at 538. Never mind the fact that Russo has not demonstrated the witnesses' willingness to testify or show how their testimony would have supported his theory that he was not present at Holik's home. *Id.* Russo cannot succeed on his ineffective assistance of counsel claim with such a deficient showing.

### iv.     Failure to Investigate Crime Scene Videos

Russo asserts his counsel failed to investigate a crime scene video and determine whether a pool of vomit depicted in the video contained DNA evidence from the "actual murderer." Mem. [#2] at 19. This claim fails for two primary reasons. First, the record indicates the investigators failed to take samples of the vomit before it was cleaned up. *See* Detective De Los Santos Trial Testimony at 50. Second, as the Court noted above, even assuming the liquid depicted in the video was vomit and not dog excrement, the DPS crime lab in Austin had no established procedures for testing vomit at that time. In any event, as Mills explained, the high level of liquid and correspondingly low amount of skin cells typically contained in vomit samples makes DNA testing difficult, if not impossible. Accordingly, Russo has not established

his counsel's performance was deficient for failing to test vomit samples that were never collected.

### v.    Refusal to Investigate "Surprise Witness"

Russo contends his counsel's failure to investigate and prepare for the testimony of the State's "surprise witness," Robert Hebner, was in error. At trial, Hebner testified he recalled that at the approximate time of the murder two years prior, there was a gold or brown van parked in Holik's driveway. Russo insists his counsel's performance was deficient for failing to investigate Hebner and ultimately impeach him on the stand, which, according to Russo, would have "raise[d] evidence of motive for the victim's fiancé's murder of Holik." Mem. [#2] at 20.

Indeed, the trial court provided Russo's counsel with an opportunity to interview Hebner before the prosecutor questioned Hebner regarding his recollection. After interviewing Hebner, Russo's counsel concluded additional time to investigate or question Hebner would not have been beneficial to the defense. Attorney Decl. at 16. At trial, Russo's counsel objected to Hebner's testimony on the basis of "surprise" and proceeded to thoroughly cross-examine him. *Id.* at 15–16. Hebner explained he did not originally tell the police he had seen a brown or gold van parked at Holik's house because he originally believed Holik was murdered at night, between 8:00 p.m. and 10:00 p.m., and he only remembered seeing a van parked in front of Holik's house around 5:15 p.m. when he was returning from work. State Ct. R. [#18-4] (Robert Hebner Trial Test.) at 11–12. According to Hebner, it was not until trial began that he learned Holik was actually murdered between 4:00 p.m. and 6:00 p.m. *Id.* at 11. At that point, Hebner realized his sighting of the gold or brown van at the approximate time of the murder was relevant. Hebner further testified he had tried not to pay attention to media coverage of the trial, and at the time of trial he still did not know what kind of vehicle Russo drove. *Id.* at 13.

After interviewing Hebner, Russo's counsel made an informed, strategic decision to object to his testimony on the basis of surprise and to impeach him on cross-examination by questioning his earlier failure to tell the police of the van he saw parked at Holik's house. The state habeas court found counsel's statements in their affidavits to be credible and concluded counsel was not ineffective for making the strategic decision not to further investigate Hebner. State Habeas Proceeding ¶ 17–21; *see Skinner v. Quarterman*, 528 F.3d 336, 341 (5th Cir. 2008) ("A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."). Moreover, Russo has not shown what more his counsel could have discovered or how this other evidence would have aided his defense. Under the *Stickland* standard, this Court must give deference to the state court's factual findings and deny habeas relief if there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *See Harrington*, 562 U.S. at 105. With no inclination from Russo as to how additional time with Hebner would have revealed Holik's fiancé as the true murderer, the Court concludes there is sufficient record evidence to support the state court's conclusion that Russo's counsel was not deficient.

**vi.     Failure to Object under Rule 404(b)**

Russo maintains his counsel was ineffective for failing to object under Rule 404(b) of the Texas Rules of Evidence to the introduction of images taken from "necrobabes.com" as impermissible evidence of extraneous bad acts. *See* TEX. R. EVID. 404(b). At trial, Russo's counsel objected to this evidence on the basis of relevancy under Rules 401 and 403, arguing the images were either irrelevant or unfairly prejudicial. The trial court sustained some of these objections, but permitted into evidence images depicting a woman being strangled in her home.

19

The decision to object to this evidence solely on the basis of relevancy and unfair prejudice is a strategic choice. There is a strong presumption that counsel's assistance was reasonable. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* As noted above, in order to make out an ineffective assistance of counsel claim based on counsel's strategic decision, Russo must show the decision was "so ill chosen that it permeates the entire trial with obvious unfairness." *See Skinner*, 528 F.3d at 341.

In this case, Russo's counsel testified they chose not to object to the proffered evidence on the basis of Rule 404(b), because Russo's viewing of the images did not constitute evidence of extraneous bad acts. Attorney Decl. at 9–10. Moreover, counsel was concerned that such an objection would open the door to more evidence regarding Russo's plan or scheme to murder Holik. The state habeas court concluded counsel's strategic decision to object only on the basis of Rules 401 and 403 was reasonable, and even assuming Russo's counsel performed deficiently, Russo failed to show how he was prejudiced by this deficient performance. State Habeas Proceeding ¶ 27–29.

Russo has not shown the state court's decision was unreasonable or contrary to the clearly established standard set forth in *Strickland*. In a habeas petition, the petitioner must meet a doubly deferential burden of showing the "state court's decision—that [the petitioner] did *not* make the *Strickand* showing—was contrary to, or involved an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*)." *See Schaetzle*, 343 F.3d at 444. Russo simply points to the Third Court of Appeal's conclusion that defense counsel waived his objection on the basis of Rule 404(b) by failing to timely object. *See* Mem. [#2] at 21. However, this merely shows Russo's counsel failed to object under Rule 404(b); it does not

prove that his counsel's strategic decision was unreasonable. Moreover, Russo cannot show that a Rule 404(b) objection would have excluded these images, nor can he show that he suffered prejudice as a result of counsel's strategic decision. Accordingly, this ground for relief fails.

### vii.  Inadequate Cross-examination

Russo claims his counsel's efforts were deficient and prejudiced him, because counsel failed to vigorously cross-examine the realtors and homeowners at trial when they testified Russo made them uncomfortable and nervous. Russo contrasts his counsel's performance at a pretrial hearing, where counsel questioned these witnesses about Russo's struggle with Tourette's Syndrome, with counsel's failure to similarly cross-examine these witnesses at trial.

The decision to cross-examine a witness is strategic, and therefore "usually will not support an ineffective assistance claim." *See United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (internal quotations omitted). Russo's counsel explained they objected in writing to the testimony of these witnesses as irrelevant and prejudicial at the pretrial hearing, but decided at trial it would not be a "fruitful strategy for the Defense" to cross-examine the women about Russo's "conduct that upset and frightened them." Attorney Decl. at 17. The state habeas court concluded counsel's strategic decision was reasonable. State Habeas Proceeding ¶ 38–39. Although Russo takes issue with his counsel's strategy, he again fails to show the state court's decision was unreasonable or contrary to the clearly established standard set forth in *Strickland*. Even assuming the decision was unreasonable, he has not demonstrated how his counsel's strategic decision to not cross-examine these witnesses at trial prejudiced him.

### viii.  Failure to Call Rebuttal Witnesses

Russo faults his trial counsel for failing to call various rebuttal witnesses who would have (1) explained why Russo held himself out as a qualified cash buyer of homes outside his

financial range, (2) testified that the zip tie found on his property did not belong to him, and (3) attributed the witnesses' statements that they were uncomfortable around Russo to his Tourette's Syndrome, which typically caused "person's not familiar with this syndrome to feel uncomfortable." *See* Mem. [#2] at 23. Again, however, Russo has failed to meet the standard set forth in *Day* by failing to demonstrate the witnesses' availability and willingness to testify, provide the Court with the content of each witnesses' prospective testimony, and demonstrate why the testimony would have been favorable to this defense. *See Day*, 566 f.3d at 538. Like his other claims regarding uncalled witnesses, this claim falls far short of establishing ineffective assistance of counsel.

ix.    **Failure to Impeach Witness Brady Mills**

Russo's final claim for ineffective assistance of counsel is based on his counsel's alleged failure to impeach Brady Mills when he was testifying about the DNA samples in Russo's case. According to Russo, his counsel should have impeached Mills by asking him about the alleged investigation of the DPS crime lab in Austin. However, the Court reiterates its earlier conclusion that there is no evidence in the record suggesting the DPS crime lab in Austin was under investigation when Russo's case was being investigated. *See supra* Section II.C. Russo's counsel did not perform deficiently when they chose not to impeach Mills on the basis of a supposed investigation of the DPS crime lab in Austin without any foundation for this line of questioning.

### Conclusion

This Court agrees with the Magistrate Judge. Russo has not shown the state court's rejection of his claims was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Russo's claims for federal habeas corpus relief are denied.

An appeal may not be taken to the court of appeals from a final order in a proceeding under § 2254 "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Proceedings, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejects a movant's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Russo's § 2254 Petition on substantive or procedural grounds, nor find the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484)). Thus, a certificate of appealability shall not issue.

Accordingly,

IT IS ORDERED that the Report and Recommendation of the United States Magistrate Judge [#25] is ACCEPTED;

IT IS FURTHER ORDERED that Petitioner Patrick Russo's Petition for Writ of Habeas Corpus [#1] is DENIED;

IT IS FINALLY ORDERED that a certificate of appealability is DENIED.

SIGNED this the ___4th___ day of December 2015.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE